# IN THE SUPREME COURT OF IOWA

No. 19–0945

Submitted September 16, 2021—Filed June 30, 2022

Amended July 22, 2022

**STATE OF IOWA,**

    Appellee,

vs.

**STANLEY LIGGINS,**

    Appellant.

---

Appeal from the Iowa District Court for Scott County, Marlita A. Greve, Judge.

Defendant appeals his conviction for first-degree murder after his fourth retrial. Defendant seeks a new trial or dismissal based on juror misconduct, evidentiary errors, and due process violations. **AFFIRMED.**

Appel, J., delivered the opinion of the court, in which all justices joined.

Martha J. Lucey, State Appellate Defender, Melinda J. Nye (argued), Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, Richard Bennett (argued), Special Counsel, for appellee.

**APPEL, Justice.**

In this case, Stanley Liggins raises a number of challenges to his conviction of first-degree murder arising from events in 1990 after his *fourth trial* almost thirty years after the crime. Liggins asserts that his conviction cannot stand as a result of (1) juror misconduct, (2) the admission of transcript testimony of a deceased witness without a full opportunity for cross-examination, (3) the admission of unreliable testimony from a witness who provided an inconsistent and changing version of events, (4) the admission of unreliable testimony from a jailhouse informant, (5) the admission of an eyewitness who was intoxicated when first identifying Liggins from a photo array and whose subsequent trial identification was tainted by one-person-identification procedures, (6) the erroneous exclusion of hearsay statements from a witness who recalled comments of the victim about abuse at home years prior to her death, and (7) a violation of due process because his trial occurred more than thirty years after the events as a result of delays arising in part from the granting of a motion for postconviction relief and a subsequently hung jury.

For the reasons expressed below, we affirm the conviction.

**I. Factual and Procedural Background.**

**A. Procedural Background.** Stanley Liggins was first charged with murder, willful injury, first-degree sexual abuse, and first-degree kidnapping in connection with the death of J.L. on September 17, 1990. On appeal, we concluded that there was jurisdiction in Iowa to support the criminal prosecution

for murder but no other alleged offenses, that the State offered sufficient evidence to support a murder charge, that Liggins was not in custody when questioned and voluntarily consented to a search of his apartment, and that testimony related to a jailhouse confession was sufficiently corroborated to be admissible. *State v. Liggins*, 524 N.W.2d 181, 184–88 (Iowa 1994). However, we also found that evidence that Liggins had sold cocaine to the victim's mother and her husband was irrelevant, improperly admitted into evidence, and inherently prejudicial. *Id.* at 188–89. Because of the taint of the improperly admitted evidence, Liggins's convictions were reversed and the case remanded for a new trial on the murder charge. *Id.* at 189.

Upon retrial, Liggins was convicted of first-degree murder. Liggins again appealed. *State v. Liggins*, 557 N.W.2d 263 (Iowa 1996). On his second appeal, we held that there was evidence to support jurisdiction in Iowa, that jury instructions related to felony murder and participating in a public offense were proper, that the admission of prior trial and deposition testimony of a mentally incompetent witness did not violate Liggins's Sixth Amendment rights under the Federal Constitution, and that there was sufficient evidence to support the verdict. *Id.* at 266–70.

Liggins then filed an action for postconviction relief in the district court. *Liggins v. State*, No. 99–1188, 2000 WL 1827164, at *1 (Iowa Ct. App. Dec. 13, 2000). He alleged that the State suppressed evidence and knowingly allowed a witness to present false testimony, that newly discovered evidence required a

new trial, and that direct appeal counsel was ineffective for failing to challenge the change of venue from Davenport to Dubuque. *Id.*

The district court appointed a special master to review the files of the prosecution and the defense to determine what information was not in the defense files. *Id.* The special master determined that the State had not disclosed seventy-seven police reports. *Id.* Liggins focused his attack on four reports of witnesses that were withheld from the defense. *Id.* The district court, however, found that the undisclosed reports were not material on the issue of guilt. *Id.* The district court also rejected Liggins's claim that the State knowingly put on false testimony from several witnesses. *Id.* at *6. The district court further rejected claims that newly discovered evidence justified a new trial, *id.* at *7–10, and that Liggins's counsel was ineffective for failing to object to a change of venue to Dubuque County, which Liggins claimed was a "hotbed for racial hatred," *id.* at *7–9.

The court of appeals affirmed the district court on all claims. *Id.* at *4–5, 10. The court of appeals emphasized that there is no reasonable probability that the result would have been different if the suppressed evidence had been produced. *Id.* at *10. At the time of the 2000 appeal, the sole issue was the failure of the State to produce witness statements with respect to four witnesses. *Id.* at *1–5 (relating to Sarah Bea, Daryl Sheese, Shawn Saunders, and Michael Armstrong).

In 2007, Liggins launched a second action for postconviction relief. *Liggins v. State*, No. 12–0399, 2013 WL 5963013, at *1 (Iowa Ct. App. Nov. 6,

2013). Among other things, Liggins alleged that the State withheld information that W.H., a witness who placed a vehicle owned by Liggins in the vicinity of the body, was a paid informant. *Id.* At the hearing before the district court, Liggins established that W.H. was a paid informant who participated in as many as eighty drug buys for the Davenport police. *Id.* The district court concluded that the State had improperly withheld the information but ultimately decided that the evidence was not material to the outcome. *Id.* at *1–2.

The court of appeals reversed. *Id.* at *8. It found that when considered in context, the cumulative impact of the withholding of exculpatory information from the three witnesses in the first action for postconviction relief and the withholding of information about the informant activity of a key prosecution witness in the second postconviction proceeding required a new trial. *Id.* at *4–8.

Liggins's third trial commenced on August 30, 2018. The jury failed to reach a verdict after three days of deliberation, and the district court declared a mistrial.

Liggins's fourth trial began on March 12, 2019. The jury returned a guilty verdict. The district court denied Liggins's posttrial motion for a new trial. This appeal followed.

**B. Factual Overview of Evidence at Fourth Trial.** The State's evidence at trial revealed that on September 17, 1990, nine-year-old J.L. returned to her home in Rock Island after shopping with her mother, Sheri, and stepfather, Joseph Glenn. At that time, a number of adults were coming and going from the

house, including Stanley Liggins. Shortly after arrival at the Glenn home, J.L. left on a bicycle to play with friends. Liggins left the home shortly after J.L.'s departure.

Liggins owned a red or maroon four-door Peugeot with his girlfriend, Brenda Adams. The mother of a friend of J.L.'s testified that on the afternoon of September 17, she saw Liggins stop his Peugeot while J.L. was on her bike and talk with her outside the witness's home. Another neighborhood woman testified she saw a man in a red or maroon four-door Peugeot beckon J.L. to the car and talk to her that afternoon.

J.L. later returned home. Liggins returned to the Glenn home as well. Liggins gave J.L. a dollar and asked her to go to the nearby Mac's Liquor store to purchase gum for him. She left on foot. After J.L. left the home, Liggins also left. The owner of the liquor store testified that between 6:15 and 6:30 p.m., J.L. entered the store and bought a pack of gum "for a friend."

A State's witness, Antonio Holmes, testified that he had gone to the same convenience store to buy beer after 6 p.m. and saw an African-American male standing outside. He asked the man, "How's it going," and got the response, "Okay." Inside the store, Holmes saw J.L. getting bubble gum and some change. She then left the store. After Holmes bought some beer, he exited the store. The man he had seen earlier was gone.

Four days after September 17, Holmes contacted the police after he learned J.L. had been killed. At the police station, he was interviewed and shown a photo lineup. He picked Liggins's photo as the person he had seen outside

Mac's Liquor store. The interviewing police officer noted that Holmes had been drinking and was under the influence of alcohol. The next day, however, Holmes contacted the police and told them he was drunk the previous night and was not sure of his identification of the suspect. He returned to the station on the 23rd and was shown only one photo—that of Liggins—and asked if that was the man he had seen outside of Mac's Liquor store on September 17. Holmes stated that he could not be sure. The police followed with, "You're not sure. It looks a lot like him[?]" Holmes answered, "Yeah." Two years later, at his deposition, Holmes positively identified Liggins as the man he saw outside the liquor store. When asked how he could be so sure after two years' passage of time, he said he just knew. Later at trial, he responded that it was because he was seeing him in the flesh and not as a photo.

At about 7:00 p.m., the Glenns became concerned that J.L. had not returned home. They began to search for her. Liggins called the Glenn home at about 7:38 p.m. to enquire whether J.L. had returned home and was informed that she had not. Liggins then arrived at the Glenn home. He suggested that the Glenns call 911, allegedly with a chuckle. He then left the Glenn home.

While the above initial events on September 17 occurred in Illinois, later in the evening, the theatre of the crime shifts to Iowa. A fire had been seen around the Jefferson Elementary School in Davenport at about 8:16 p.m. The fire department responded at about 9:07 p.m. The firefighters found the body of J.L. near the school. The body had been set on fire by gasoline, which had been poured on the crotch area. J.L. had been sexually abused and strangled to death.

Lloyd Eston testified through prior testimony that sometime between 8:15 and 8:30 p.m. on September 17, he saw a medium reddish car parked on the side of the road near Jefferson Elementary School. Eston saw a man standing by the car with the trunk open. Eston could not determine the race of the man. Prior to trial, Eston was shown a photo of Liggins's vehicle. He stated he was "pretty sure" the vehicle was the auto he saw that night. Eston claimed that he thought a photo of Liggins's Peugeot was the car but he could not be positive. He identified the auto as a red, four-door foreign car that was similar to Liggins's Peugeot.

W.H. testified at trial. She claimed that at the time of the crime in 1990, she was at a friend's house in the neighborhood of the school. Initially, she contacted the police anonymously, telling them that an offense might have happened in a residence nearby. Later in depositions, W.H. testified that she had seen a fire sometime after 9:00 p.m. near the school. She also observed a car parked at an intersection with one taillight brighter than the other. She identified Liggins's car as the one she saw that night because of the oddity with the taillight. W.H. did not give the details about the fire and the car initially when she contacted the police.

Brenda Adams, Liggins's girlfriend, testified at trial. She told the jury that she lived in an apartment in Milan, Illinois, while Liggins lived at the Hillside Inn in Rock Island. Because guests were not allowed at her apartment, Adams would take Liggins home early in the morning before her apartment manager arrived.

Adams testified that Liggins called her apartment at about 10 p.m. on September 17, stating he would arrive shortly. He did not arrive, however, until between midnight and 12:30 a.m. Liggins asked Adams whether she "would love him no matter what," a query which Adams thought was odd because they "weren't in that kind of relationship at the time." Adams testified that she did not smell gas on Liggins when he was in her apartment that night nor did she smell gas when she went to the car to get a cigarette. When she drove Liggins back to his apartment the next morning, however, she smelled gas.

Adams testified that on the evening of September 17 or 18, she slept in her bedroom and assumed Liggins slept on the couch. She agreed that Liggins could have left the apartment and returned in the night or early morning. The State presented evidence suggesting that Liggins in fact returned to his apartment and took a lengthy shower lasting forty-five minutes in the early morning hours of September 18.

The State offered the testimony of Donna Adkins at trial. She stated that on the day after the murder, she was helping a friend move out of the Hillside Apartments, which were adjacent to the Hillside Inn where Liggins lived. She saw a red car in the parking space assigned to her friend's apartment. At about 11 a.m., she walked past the car, which she identified as a red Peugeot, and noted that it reeked of gasoline. She saw a gas can in the backseat. The odor of gasoline was so strong that she cautioned a female companion not to smoke in the vicinity of the car. When interviewed by police, Liggins admitted that he kept

a gas can in the trunk of the car but claimed that he had not used it for months and had not left it in the passenger portion of the car.

Frank Reising testified at trial. He shared a jail cell with the defendant in Scott County for several weeks in 1992. Reising testified that at one point, the two of them were watching a news story about the murder. Reising could not recall the exact words but asserted something like, "I may have done it, but I'm not going to get caught for it."

Evidence of a voluntary police interview with Liggins on September 19 was admitted into evidence. Liggins admitted he was at the Glenn home at about 6 p.m. and that he offered J.L. a dollar to buy him gum. He stated that he left the house after fifteen minutes, however, and returned to the house at about 8:45 p.m. When he learned that J.L. had not returned, he suggested that the police be called. Liggins then returned to his apartment for a while before joining his girlfriend to watch TV. When asked if he had seen J.L. anywhere else but the Glenn home, Liggins at first said no, but he later admitted that he had talked to her in the street before he arrived at the Glenn home. Finally, Liggins admitted that he kept a gas can in the trunk of the Peugeot but asserted that he had not used it in months.

At trial, the State did not present any forensic evidence linking Liggins to the crime. The State offered evidence that the carpet in the backseat of the Peugeot was wet when searched by police, suggesting that the area had been washed. Further, the State offered evidence that a plastic bag was found under

the victim's body that was consistent with the type of garbage bag in the storage area of the Hillside Inn where Liggins lived.

**C. Facts Related to Alleged Juror Misconduct and Jury Verdict.** After hearing the evidence, the jury began deliberating on April 1, 2019, at 12:58 p.m. At 3:26 p.m., the jury submitted a question to the court. The question was: "What time was Monday Night Football scheduled on 09/17/1990?" The question could have related to the testimony of Holmes or another witness, Rodney Sinclair, who testified that he saw Holmes on the night of the murder at his Hillside apartment. After consulting both sides, the court advised the jury: "You have received all the evidence. Please review your notes and memories." After further deliberations, the jury was dismissed for the day at 4:30 p.m.

When releasing the jurors for the day, the court attendant had a conversation with one of the jurors. The juror explained that her son's friend was on the previous jury and that "he told her that the jury was hung," The juror stated that she shared the information with a number of the jurors.

As the juror was leaving, the court attendant was approached by another juror. The second juror told the attendant that the first juror had told "everyone" that the prior jury was hung.

The district court advised the attorneys of the situation and gave them the night to think about it. The next day, Liggins's attorney advised the court that Liggins would not move for a mistrial. Liggins's attorney noted that speculation about the prior jury "would have been out there anyway, given the odd

procedural history of the case." The State also took the position that a mistrial was not necessary.

The district court concluded, "[W]e have not reached the level of a mistrial yet. I do believe Mr. Liggins can still get a fair trial in terms of the jury deliberating this fairly." As a result, the district court took no action on the matter.

After determining not to declare a mistrial, the parties developed an additional instruction to the jury to deal with the problem. Liggins's counsel did not want an instruction that would "exaggerate" the importance of the matter. The parties agreed on the following additional instruction: "This case shall be tried on the evidence presented in the courtroom during the trial only. Final Instruction No. 6 defines what evidence is and is not. Each juror shall abide by the admonition that prohibits a juror from communicating about this case with anyone. Please continue your deliberations."

The jury continued deliberations and returned a guilty verdict. Liggins appealed.

**II. Jury Misconduct.**

**A. Standard of Review.** Liggins maintains the proper standard of review for a jury misconduct case is de novo. In support of his position, he cites *State v. Watson*, 620 N.W.2d 233, 235 (Iowa 2000) (en banc). In *Watson*, we held that even though a defendant did not object, the trial judge knew or should have known about a conflict between the defendant and counsel and had a duty to inquire into the conflict. *Id.* at 237–38.

The State disagrees. The State suggests that *Watson* is inapplicable as it involves a conflict between an attorney and a client, not jury misconduct. With respect to jury misconduct, the State urges us to adopt the concurring opinion of three judges in *State v. Christensen*, stating that the proper standard of review in juror misconduct cases is abuse of discretion. 929 N.W.2d 646, 681–85 (Iowa 2019) (Waterman, J., concurring specially).

**B. Position of Liggins.** Liggins asserts that under the Sixth Amendment to the United States Constitution and article I, section 9 of the Iowa Constitution, a criminal defendant is entitled to a fair trial before an impartial jury. In order to have a constitutionally adequate fair trial in this case, Liggins argues that the district court was obligated to inquire further into the scope and extent of jury misconduct even in the absence of a request by one of the parties. He claims his conviction should be vacated and the case remanded to the district court for a hearing to determine the impact of the misconduct on the jury and whether it was prejudicial. If the State fails to show the misconduct was harmless, Liggins urges, he should be granted a new trial.

In support of his claim, Liggins cites *Remmer v. United States*, 347 U.S. 227 (1954). In *Remmer*, the district court learned that jurors had conversations with third parties seeking to influence the verdict but the court relied on an FBI investigation to resolve the issue without notifying the defendants. *Id.* at 228. The United States Supreme Court stated that when the trial court becomes aware of outside communications with a juror, the trial court has a duty to "determine the circumstances, the impact thereof upon the juror, and whether

or not it was prejudicial, in a hearing with all interested parties permitted to participate." *Id.* at 229–30.

Liggins also cites three cases for the proposition that a trial court should hold a hearing into allegations of extraneous influence on a jury even in the absence of a request by a party. In *United States v. Corrado*, the United States Court of Appeals for the Sixth Circuit held that the district court abused its discretion by "failing to conduct an adequate evidentiary hearing into the allegations of extraneous influences on the jury." 227 F.3d 528, 536 (6th Cir. 2000). Similarly, in *United State v. Davis*, the Sixth Circuit Court of Appeals held that discovery of a credible claim of jury misconduct required a hearing under *Remmer* notwithstanding the fact that the defendant had not expressly requested a hearing. 177 F.3d 552, 556–57 (6th Cir. 1999). Finally, in *State v. Brown*, the Connecticut Supreme Court held that the trial court must conduct a "preliminary inquiry, on the record, whenever it is presented with any allegations of jury misconduct in a criminal case, regardless of whether an inquiry is requested by counsel." 668 A.2d 1288, 1303 (Conn. 1995) (footnote omitted).

Liggins recognizes that we have not yet held that a hearing in cases of jury misconduct is required without a request of a party. Liggins notes that our cases generally suggest that the district court may—but is not required to—hold such a hearing but that all doubts should be resolved "in favor of granting a poll of jurors on the misconduct issue." *See State v. Gathercole*, 877 N.W.2d 421, 433 (Iowa 2016) ("[W]e encourage courts to resolve doubts about whether information published midtrial requires a poll . . . in favor of granting a poll."); *State v. Frank*,

298 N.W.2d 324, 327 (Iowa 1980) ("[T]he matter rests in the sound discretion of the trial court."); *State v. Bigley*, 202 N.W.2d 56, 58 (Iowa 1972) (stating the court "may on its own motion or shall on motion of either party question each juror" (quoting ABA Project on Minimum Standards for Crim. Just., *Standards Relating to Fair Trial and Free Press* 3.5(f) (1968))).

But Liggins draws support from other types of potential constitutional violations cases where courts have a duty to enquire sua sponte into the nature of the problem. *See Watson*, 620 N.W.2d at 241 (holding there is duty sua sponte to inquire into the propriety of the defendant's representation where a "defendant's trial counsel had an actual conflict of interest that the trial court knew or should have known existed"); *State v. Mann*, 512 N.W.2d 528, 531 (Iowa 1994) (holding that the court "has an absolute responsibility to order a hearing sua sponte" when there are sufficient doubts about a defendant's mental capacity). Liggins contends that even if only one juror was improperly influenced, reversal is required. *See Christensen*, 929 N.W.2d at 679 (majority opinion).

Turning to the facts, Liggins notes that it is not clear whether the juror spoke with her son or directly with the former juror about the previous trial. Further, Liggins notes that while the juror referred to the prior trial juror as "Christy," no such name appears on the jury list of the prior trial. These matters, according to Liggins, should have been cleared up sua sponte by the district court.

Finally, Liggins notes irony in the handling of jury matters in this case. During voir dire, a prospective jury member was disqualified for cause because

the prospective juror knew that the prior jury was hung. Further, Liggins notes that the trial court expressed concern that other jurors may have been similarly tainted. Liggins contrasts the pretrial attitude of the district court with its posttrial attitude on the same issue.

**C. Position of the State.** The State first asserts that Liggins waived any fair trial claim rising out of jury misconduct. The State emphasizes that Liggins's counsel did not indicate any desire for further investigation and, in fact, did not want a mistrial.

On the merits, the State recognizes that Liggins has a constitutional right to a fair and impartial jury. But, according to the State, the defendant also has a right to decide and pursue a chosen theory of the case. The State argues that "The determination by the trial court to abort a criminal proceeding where jeopardy has attached is not one to be lightly undertaken, since the interest of the defendant in having his fate determined by the jury first impaneled is itself a weighty one." *Illinois v. Somerville*, 410 U.S. 458, 471 (1973). As stated by defense counsel at the hearing, "In talking it over with Mr. Liggins, we are—we're not going to move for a mistrial." Instead, Liggins agreed to a mild but appropriate instruction urging the jurors to arrive at their verdict based upon the evidence presented in the courtroom.

**D. Discussion.** A threshold question is the proper standard of review. Ordinarily, when constitutional issues are involved, we have repeatedly stated over decades of cases that our review is de novo. *See, e.g., State v. Lane*, 726 N.W.2d 371, 377 (Iowa 2007) (applying de novo review to a search and seizure

issue); *Armento v. Baughman*, 290 N.W.2d 11, 15–16 (Iowa 1980) (reviewing de novo a denial of due process where a witness for prosecution did not disclose promises to a witness); *Watts v. State*, 257 N.W.2d 70, 71 (Iowa 1977) ("When . . . issues as to the violation of constitutional safeguards are raised, we are obliged to make an independent evaluation of the totality of the circumstances shown by the entire record under which rulings on such constitutional rights were made. That is to say, when a constitutional issue is presented, the evidence relative to that issue is reviewed by us de novo."); *Rinehart v. State*, 234 N.W.2d 649, 658 (Iowa 1975) (en banc) (applying de novo review to a constitutional issue involving ineffective assistance of counsel); *State v. Boren*, 224 N.W.2d 14, 15 (Iowa 1974) (applying de novo review in determining voluntariness of statements).

An instructive precedent for this case is *Sheppard v. Maxwell*, 384 U.S. 333 (1966). In *Sheppard*, the defendant claimed that unfair pretrial publicity prevented him from having a fair trial. *Id.* at 335–42. The Supreme Court emphasized that on appeal, "appellate tribunals have the duty to make an independent evaluation of the circumstances." *Id.* at 362. In *State v. Elmore*, we cited *Sheppard* with approval in holding that review of constitutional matters related to pretrial publicity is de novo. 201 N.W.2d 443, 445 (Iowa 1972). In *Elmore*, we specifically overruled *Harnack v. District Court*, 179 N.W.2d 356, 360 (Iowa 1970) (reviewing change of venue for errors at law). *Elmore*, 201 N.W.2d at 445. We also cited with approval *Maine v. Superior Court*, 438 P.2d 372, 376–78

(Cal. 1968), which rejected an abuse of discretion standard in favor of de novo review in light of *Sheppard*. *Elmore*, 201 N.W.2d at 445.

But even applying the more stringent de novo review standard, we agree with the State that the handling of the jury misconduct issue does not provide grounds for reversal. There may be situations when the district court has an obligation to inquire further into jury misconduct under *Remmer*, but not on the unique facts of this case. Here, the improper disclosure to the jury—that there had been a prior hung jury—would not have been a shock to the jury. The jury knew that there had been prior trials as transcripts of testimony from them were read into the record. In addition, the fact that a prior jury was hung is not the kind of inflammatory disclosure with a strong likelihood of causing prejudice to Liggins. Further, Liggins and his counsel appear to have made a strategic choice to have his fate decided by the jury notwithstanding the improper disclosure to the jury. The right to make this strategic choice is a weighty one. *See Somerville*, 410 U.S. at 471. The parties agreed on the appropriate proportionate remedy for the misconduct; namely, a relatively mild instruction that reminded the jury to make its decision based only upon the evidence at trial.

The case is materially different from situations where the court has reason to believe there is a conflict between a lawyer and a client. *See Watson*, 620 N.W.2d at 237–38. In the attorney–client conflict setting, further sua sponte inquiry by the district court may be necessary to ensure that the lawyer is not advancing his own interests at the expense of his client. *See id.* Here, however, there is no suggestion of attorney–client conflict on the question of whether to

proceed to verdict with the jury notwithstanding the unfortunate disclosure that a prior jury had been hung in the case.

**III. Admission of Testimony of Deceased Witness Donna Adkins.**

**A. Introduction.** At trial, Liggins moved to exclude the prior testimony of Donna Adkins pursuant to the balancing test provided in Iowa Rule of Evidence 5.403, which provides: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice . . . ."

The State separately moved to admit the testimony under Iowa Rule of Evidence 5.804(*b*)(1) because Adkins was deceased. Under this rule, prior testimony may be offered into evidence as an exception to the hearsay rule if the party against whom the evidence is offered had "an opportunity and similar motive to develop it by direct, cross-, or redirect examination" in the prior proceeding. Iowa R. Evid. 5.804(*b*)(1)(B).

At the hearing on the admissibility of Adkins's prior testimony, Liggins asserted that he did not have an adequate opportunity to cross-examine Adkins in the prior proceeding because the State had withheld several witness statements. Those statements would have provided Liggins's counsel with impeachment material to attack Adkins's testimony that she saw a red Peugeot in the parking lot at the Hillside complex, that a gas container was in the backseat, and that it reeked of gasoline. Liggins further asserted that admission of the prior testimony would violate his confrontation rights under the Federal

and Iowa Constitutions. The district court denied Liggins's motion under rule 5.403 and granted the State's motion under rule 5.804(*b*)(1).

Decisions to admit or exclude evidence under rule 5.403 are reviewed for abuse of discretion. *State v. Rodriquez*, 636 N.W.2d 234, 239 (Iowa 2001). The moving party "has the burden to establish that the district court abused its discretion in making its decision on admissibility." *State v. Lacey*, 968 N.W.2d 792, 806 (Iowa 2021). When a defendant challenges the admission of hearsay evidence under the Confrontation Clauses contained in the Sixth Amendment to the Federal Constitution and article I, section 10 of the Iowa Constitution, the State has the burden of showing that the Confrontation Clause has been satisfied. *State v. Schaer*, 757 N.W.2d 630, 635 (Iowa 2008). Our review of the application of the rule 5.804 exception to the hearsay rule is for errors at law. *State v. Paredes*, 775 N.W.2d 554, 560 (Iowa 2009).

**B. Position of Liggins.** Witness Donna Adkins testified at Liggins's trials in 1993 and 1995 but was deceased at the time of Liggins's third trial in 2018. She testified at prior trials that on the day after the murder, she was helping a friend, Daryl Sheese, move out of the Hillside Apartments, which were located adjacent to the Hillside Inn where Liggins resided. She testified that she saw a red Peugeot parked in the parking lot with a gas can in the backseat that reeked of gasoline so much that she cautioned a friend not to smoke a cigarette in the vicinity.

Although her testimony was hearsay, the district court admitted it under Iowa Rule of Evidence 5.804(*b*)(1). That rule permits the admission of prior

testimony of a deceased witness provided that the opposing party had a full and fair opportunity to cross-examine the witness when the prior testimony was given. *Id.* On appeal, Liggins claims he did not have a full and fair opportunity to cross-examine Adkins when she gave her prior testimonies and that the evidence should have been excluded under rule 5.403 or as a violation of his right to confrontation. Both of Liggins's claims are based upon the theory that at the time of his cross-examination of Adkins in the prior trials, he did not have access to the statements of three witnesses—Daryl Sheese, Shawn Saunders, and Michael Armstrong—which the State improperly suppressed under *Brady*. *See Brady v. Maryland*, 373 U.S. 83, 87–88 (1963) (holding that due process requires the prosecution to disclose exculpatory evidence to the accused in criminal cases). Liggins claims that if he had timely access to the unproduced statements of these witnesses at the time of Adkins's prior testimony, he would have been better able to cross-examine Adkins.

In order to evaluate Liggins's claim, we look to the contents of the withheld statements. Sheese, the person whom Adkins was helping on September 18, 1990, did not recall seeing a maroon Peugeot on September 18 or any other date in the parking lot. Instead, he remembered seeing a brown Mustang in the parking lot. Shawn Saunders told police she owned a brown Mustang but not a gas can. She testified she sometimes parked the brown Mustang in the Hillside parking lot. She further stated that she had seen the Peugeot in the parking lot before. Michael Armstrong told the police that he had permission to use the

brown Mustang, that it did not have a gas can in it, and that he did not recognize the Peugeot.

Liggins argues that he did not have a full opportunity to cross-examine Adkins because he did not have the statements of Sheese, Sauders, and Armstrong that would have aided him in the cross-examination. Specifically, Liggins asserts that he could have asked Adkins about Sheese's contradictory statement and could have questioned Adkins on whether she might have mistakenly identified Liggins's car.

Liggins further asserts that his right of confrontation under the Sixth Amendment to the Federal Constitution and article I, section 10 of the Iowa Constitution were also violated by the admission of Adkins's prior testimony. While the hearsay rules and the Confrontation Clauses overlap considerably, Liggins argues that the Confrontation Clauses may prohibit the admission of evidence even where a hearsay exclusion applies. *See Crawford v. Washington*, 541 U.S. 36, 60–61 (2004). Liggins points out that the burden rests with the State to show compliance with the Confrontation Clauses. *See Shaer*, 757 N.W.2d at 635.

**C. Position of State.** The State maintains that the district court properly admitted the prior testimony of Adkins. The State presents a string of authorities for the proposition that even where new information becomes available later, what is important under rule 5.804(*b*)(1) is a similar motive to undermine the prior testimony. *See United States v. Koon*, 34 F.3d 1416, 1426–27 (9th Cir. 1994), *aff'd in part, rev'd in part on other grounds*, 518 U.S. 81 (1996); *People v.*

*Wilson*, 114 P.3d 758, 780–83 (Cal. 2005); *State v. Jones*, 791 So. 2d 622, 625–28 (La. 2001) (per curiam). The State candidly recognizes contrary authority. *See Williams v. State*, 7 A.3d 1038, 1053–55 (Md. 2010).

The State points out that the statements of Sheese, Saunders, and Armstrong may have been helpful to Liggins, but that any error would be harmless. The State notes that the defendant's girlfriend, Brenda Adams, testified that on the morning after the murder, she smelled gas in the Peugeot.

Further, the State argues that the statements of Sheese, Saunders, and Armstrong did not seriously undermine the testimony of Adkins. When shown a photo of the Peugeot, Sheese stated that he "did not recall" seeing such a car that day; Sheese did not say there was no Peugeot. The State points out that Saunders told police she had seen the Peugeot in the parking on earlier occasions. The State also notes that Michael Armstrong was only "unsure" whether he had seen the Peugeot in the parking lot. Finally, the State notes that while Saunders and Armstrong testified that they used a brown Mustang that was parked in the lot, they did not own a gas can. Adkins was quite clear that she saw a gas can in the backseat of the Peugeot on September 18 and that the smell of gasoline was so strong that she asked a female companion not to smoke.

Finally, the State makes the larger argument that the failure of the State to timely turn over the statements was harmless in light of the evidence adduced at trial. The State recognizes that the evidence was circumstantial but asserts that it was abundant. Even if it was error to admit the Adkins statements, the State argues that the error would be harmless.

On the Confrontation Clause issues, the State first asserts that Liggins failed to preserve error. In the alternative, the State suggests that Liggins's confrontation rights were fully satisfied by the prior opportunity to cross-examine the unavailable witness. *See Crawford*, 541 U.S. at 53–56.

**D. Discussion.** At the outset, we think the question is not whether counsel for Liggins had a similar motive to cross-examine Adkins at the prior trial. Plainly, counsel had a similar motive. But the real question, as suggested by Liggins, is whether the opportunity afforded Liggins's counsel in the prior trial to cross-examine Adkins was adequate in light of the failure of the State to disclose the witness statements of Sheese, Saunders, and Armstrong.

There is authority for the proposition that the failure to disclose impeachment material may deprive a party opponent of a fair opportunity to cross-examine a witness. In *Mancusi v. Stubbs*, the United States Supreme Court stated that while an opportunity to cross-examine in a prior trial needs only be roughly comparable to that available at trial, a new and significantly material line of cross-examination not touched upon in the earlier trial may be problematic. 408 U.S. 204, 215 (1972).

State courts have followed the reasoning of *Mancusi*. In *Commonwealth v. Bazemore*, the Supreme Court of Pennsylvania considered whether a party had an adequate opportunity to examine a witness at a prior trial where the state failed to disclose a prior inconsistent statement, the criminal record of the witness, and that the prosecutor was considering charges against the witness.

614 A.2d 684, 685 (Pa. 1992). The *Bazemore* court concluded the opportunity was inadequate. *Id.* at 687.

Another instructive case is *Williams v. State,* 7 A.3d 1038. In that case's first trial, the state violated *Brady* by not providing evidence that a witness was legally blind. *Id.* at 1050. The *Williams* court held that while the defendant may have had an opportunity to cross-examine the witness in the first trial, it was not an adequate opportunity in light of the state's failure to disclose impeachment material. *Id.* at 1054.

Liggins maintains that the lack of disclosure of impeachment material by the State may give rise to serious questions under the Confrontation Clause and rules of evidence relating to prior testimony of deceased witnesses in a subsequent trial.

Nevertheless, while the nondisclosed information might have provided somewhat useful direct testimony in court, the impeachment value of the information is insubstantial. Sheese apparently "did not recall" seeing a vehicle that resembled Liggins's in the parking lot on September 18, but this does not contradict Adkins's testimony. Saunders and Armstrong's interviews seem to show that a brown Mustang was parked in the parking lot on September 18, but the fact that a brown Mustang was parked in the lot is not inconsistent with Adkins's testimony that Liggins's Peugeot was also parked in the lot. In addition, Adkins was close enough to the car to smell gasoline and studied the car sufficiently to identify a round gas can in the rear seat. Under the circumstances, we conclude that the opportunity to cross-examine Adkins at the prior trials was

adequate and that the district court did not err in admitting the prior trial testimony of Adkins under rule 5.804(*b*)(1).

On the Confrontation Clause question, as the State points out, there are preservation issues. Liggins did not raise the Confrontation Clauses of the Iowa and United States Constitutions in his motion. And, at the hearing, Liggins only raised the issue in response to arguments by the State. In any event, although in some circumstances the Confrontation Clauses might be broader than our hearsay rules, we do not find this to be such an occasion. Because Liggins had an adequate opportunity to cross-examine Adkins, a constitutionally based confrontation problem is not present.

**IV. Admission of Testimony of W.H.**

**A. Introduction.** W.H. testified at trial that she saw a fire near Jefferson Elementary School in Davenport on September 17, 1990. At the time of the fire, W.H. saw a car with one taillight brighter than the other in the vicinity of the school. Liggins asserts that under rule 5.403, the district court must weigh the probative value of any testimony "against the danger of its prejudicial or wrongful effect upon the triers of fact." *State v. Huston*, 825 N.W.2d 531, 537 (Iowa 2013) (quoting *State v. Cromer*, 765 N.W.2d 1, 8 (Iowa 2009)). According to Liggins, the testimony of W.H. was so unreliable that it should have been excluded from evidence by the trial court under the rule.

Under rule 5.403, we have established a two-step framework for the district courts to apply. *State v. Webster*, 865 N.W.2d 223, 242 (Iowa 2015). First, the district court should consider the probative value of the challenged evidence.

*Id.* Second, the court balances the probative value against the danger of its prejudicial effect. *Id.* The burden is on the moving party to establish the grounds for exclusion. *McClure v. Walgreen Co.*, 613 N.W.2d 225, 235 (Iowa 2000) (en banc).

Probative value under the rule gauges the strength and force of evidence to make a consequential fact more or less probable. *State v. Thornton*, 498 N.W.2d 670, 675 (Iowa 1993). Unfair prejudice arises when the evidence prompts the jury to make a decision on an improper basis. *Pexa v. Auto Owners Ins.*, 686 N.W.2d 150, 158 (Iowa 2004).

Review of decisions of the district court regarding the admission of evidence in the face of an objection under rule 5.403 is for abuse of discretion. *Carter v. MacMillian Oil Co.*, 355 N.W.2d 52, 56 (Iowa 1984). An abuse of discretion occurs when a district court engages in an act or omission that is clearly untenable or unreasonable. *Graber v. City of Ankeny*, 616 N.W.2d 633, 638 (Iowa 2000) (en banc). Despite the discretionary nature of rule 5.403, we do not hesitate to reverse if unfairly prejudicial evidence is admitted. *Id.* When evidence has minimal probative value but its admission would have a wrongful effect on the jury, the district court should exclude the evidence on proper objection. *State v. Harmon*, 238 N.W.2d 139, 144–45 (Iowa 1976).

**B. Position of Liggins.** Liggins claims that W.H.'s testimony was unreliable because it evolved over time. On October 2, police interviewed W.H. after she gave them an anonymous tip that the suspect in the case had been "in and out" of a house in a certain location. When interviewed, W.H. made no

mention of seeing the fire or a car with one brake light brighter than the other near the school. Liggins notes that at W.H.'s deposition two years later, however, W.H. for the first time testified that she saw the fire and a car with square taillights driving nearby. In her 1993 trial testimony, W.H. testified that one taillight was stronger than the other—a distinctive feature of Liggins's Peugeot—but also said that it was because her view was obstructed by bushes. In the 1995 trial, Liggins points out the mention of bushes disappeared from W.H.'s testimony: W.H. testified that her view was not obscured and was certain that the taillights differed in their brightness.

Liggins further argues that W.H. was a paid confidential informant of the police in September 1992 when her deposition was taken. W.H.'s testimony about seeing a fire and a car with square, unevenly-lit taillights came five days after another witness of the State, Lloyd Eston, could not definitively identify the car near the Jefferson Elementary School on the evening of J.L.'s death.

Liggins argues that, as demonstrated by the hung jury in the previous trial, the case was close. Liggins believes that the testimony of W.H. was critical in placing him at the scene of the fire when it was occurring. While Liggins recognizes that Eston saw a medium reddish car at the school, Eston did not testify that the car had distinctive taillights and did not see a fire at the time.

Because the testimony of W.H. was improperly admitted, Liggins asserts that reversal is required unless the record affirmatively establishes a lack of prejudice. *See State v. Russell*, 893 N.W.2d 307, 314 (Iowa 2017). Liggins claims that the State has made no such showing.

**C. Position of the State.** The State emphasizes that Liggins was able to explore inconsistencies in W.H.'s testimony through cross-examination at trial. The State further emphasizes that at trial, W.H. testified that there was no connection between her being an informant and the testimony she gave in the case and that she was not paid for her testimony. Further, the defense had the opportunity to challenge W.H.'s credibility in both opening and closing statements. The State emphasizes it is the role of the jury to make credibility assessments. *See State v. Blair*, 347 N.W.2d 416, 420 (Iowa 1984).

The State further suggests that any error was harmless. The State claims that "[a]nother witness" provided evidence that the defendant's car was seen in the area of the fire on the night of the murder. As a result, the State contends that the evidence from W.H. was merely cumulative and reversal would not be warranted for any error. *See State v. Wilson*, 878 N.W.2d 203, 219 (Iowa 2016).

**D. Discussion.** We agree with the State. W.H.'s testimony was clearly relevant and, even though her credibility was attacked, it has some probative value. Her testimony was not so inherently unreliable that the district court abused its discretion by declining to exclude it under Iowa Rule of Evidence 5.403. In addition to attacking W.H. for her inconsistent statements and poor memory, Liggins had the opportunity to paint the State's case in a negative light because of the use of a paid informant to support its case in the trial. We cannot find that the district court abused its discretion by determining that unfair prejudice did not substantially outweigh the probative value of the testimony under rule 5.403.

**V. Admission of Testimony of Jailhouse Informant.**

**A. Introduction.** Liggins moved in limine to exclude the testimony of jailhouse informant Frank Reising, Jr., pursuant to Iowa Rule of Evidence 5.403. Reising asserted that he was a cellmate of Liggins in the Scott County jail in 1992. Reising stated that they did not speak to one another but that when a TV news report on the case appeared, Reising exclaimed to Liggins that he was a suspect in the case. According to Reising, Liggins then said something like, "I may have done it, but I'm not going to get caught for it." The district court denied the motion to exclude the Reising testimony.

**B. Position of Liggins.** Liggins attacks Reising's testimony as unreliable. He notes that at the time Reising reported the alleged conversation to jailhouse guards, Reising was hoping to get sentencing concessions on pending charges. Liggins further notes that Reising ultimately got a plea deal in which the State agreed not to pursue habitual offender enhancements in his case and agreed to concurrent rather than consecutive sentences. Although Reising was prosecuted by a different assistant county attorney, within an hour of his sentencing, Reising met with prosecutors in the Liggins case.

Liggins observes that in Reising's 1995 testimony, Reising admitted he lied to the police before to benefit himself. Yet, Reising maintained the reason he came forward was that Liggins was "a sick son-of-a-bitch." In the 2018 and 2019 trials, Liggins asserts that Reising showed further hostility toward Liggins. In 2018, Reising testified, "If I had my way about it, he wouldn't be sitting here in that chair to this day." In the 2019 trial, Reising expressed surprise that he was

put in the same cell as a "chimo." He admitted that he "had no use for him," but he stated that his animosity had "nothing to do with his skin color" and arose because of the nature of the crime. Further, Reising acknowledged that after his first postconviction-relief hearing, Reising said to Liggins "you lucky, boy" as he passed him. Liggins asserts the use of the term "boy" shows racial animus. *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456 (2006) (per curiam). Liggins maintains that Reising's comments demonstrate animosity toward Liggins because of the nature of the crime and based on race.

Liggins cites academic literature indicating that the consequences of the use of unreliable jailhouse information can be seen in studies showing that such testimony has been a factor in a number of wrongful convictions. *See Informing Injustice: The Disturbing Use of Jailhouse Informants*, The Innocence Project (Mar. 6, 2019), https://innocenceproject.org/informing-injustice [https://perma.cc/WKS3-9X4T]. The reliability problems, according to Liggins, are exacerbated by the fact that jailhouse informant testimony often involves confessions which, according to Liggins, have unique power on a jury. *See Arizona v. Fulminante*, 499 U.S. 279, 296 (1991); *State v. Schomaker*, 303 N.W.2d 129, 130–31 (Iowa 1981). Liggins acknowledges precedents that assume jurors can weigh the reliability of jailhouse informant testimony just as they weigh other evidence. *See, e.g.*, *Kansas v. Ventris*, 556 U.S. 586, 594 (2009); *Hoffa v. United States*, 385 U.S. 293, 311–12 (1966); *United States v. Cervantes-Pacheco*, 826 F.2d 310, 314–15 (5th Cir. 1987). But, citing academic authority, Liggins asserts that jurors simply are "insensitiv[e] to the increased unreliability of incentivized

witness testimony," which is magnified by the fact that typical jurors "do not understand how easy it is for jailhouse snitches to manufacture detailed false confessions" or regard the testimony as impliedly bolstered because it is presented by the prosecution. *See* Russell D. Covey, *Abolishing Jailhouse Snitch Testimony*, 49 Wake Forest L. Rev. 1375, 1393–94 (2014) [hereinafter Covey].

For the above reasons, Liggins argues that the testimony of Reising should have been excluded. He asserts that reversal is required unless the record affirmatively establishes a lack of prejudice. *See Russell*, 893 N.W.2d at 314.

**C. Position of the State.** The State recognizes that Liggins preserved his challenge under Iowa Rule of Evidence 5.403 that the testimony of Reising was unreliable and should not have been admitted. To the extent that Liggins argues that social science supports a rule that testimony of informants per se should not be admitted, the State claims Liggins failed to preserve error by failing to present the social science research to the district court. *See State v. Taylor*, 310 N.W.2d 174, 177 (Iowa 1981).

**D. Discussion.**

1. *Introduction.* There is a growing body of literature on the subject of testimony by informants generally and jailhouse informants particularly. *See, e.g.*, Covey, 49 Wake Forest L. Rev. at 1429 (urging categorical exclusion of jailhouse informant testimony); Melanie B. Fessinger et al., *Informants v. Innocents: Informant Testimony and its Contribution to Wrongful Convictions*, 48 Cap. U. L. Rev. 149, 150, 185–86 (2020) [hereinafter Fessinger] (suggesting risk of wrongful conviction based on informant testimony is high and urging more

research and development of effective safeguards); Jessica A. Roth, *Informant Witnesses and the Risk of Wrongful Convictions*, 53 Am. Crim. L. Rev. 737, 794–97 (2016) [hereinafter Roth] (urging numerous reforms to improve reliability of informant witnesses).

As noted by Liggins, much of the literature emphasizes the inherent unreliability of jailhouse informants. It has been repeatedly suggested that the use of jailhouse informants is a major cause of wrongful convictions. *See* Covey, 49 Wake Forest L. Rev. at 1378–79; Fessinger, 48 Cap. U. L. Rev. at 150, 179; Roth, 53 Am. Crim. L. Rev. at 797. Concern over the potential of wrongful convictions is seen in the American Bar Association's position that no one should be convicted of a criminal offense based solely upon the testimony of an informant. *See* Peter A. Joy, *Constructing Systemic Safeguards Against Informant Perjury*, 7 Ohio St. J. Crim. L. 677, 680–81, 681 nn.11–12 (2010) (quoting ABA Resolution 108(b), adopted by the House of Delegates on February 14, 2005).

The reliability of jailhouse informants has also been a subject of concern in federal courts. For instance, in *Hoffa v. United States*, Chief Justice Earl Warren noted that the use of jailhouse informants had "a serious potential for undermining the integrity of the truth-finding process in the federal courts." 385 U.S. at 320 (Warren, C.J., dissenting). Yet, when the United States Supreme Court considered the reliability of a jailhouse informant in *Kansas v. Ventris*, the Court, in a Spartan footnote, provided dicta that the problem of the reliability of jailhouse informants did not give rise to due process problems but instead presented a question for the jury to determine. 556 U.S. at 594 n.*.

Liggins has not cited, and we have not found any, state court authority for the proposition that testimony from jailhouse informants should be categorically barred because of its unreliability. There is, however, state court authority refusing to categorically ban jailhouse informants because of reliability problems. *Thomas v. State,* 853 S.E.2d 111, 116 (Ga. 2020).

Yet, state courts have addressed the reliability problem with jailhouse informants in a number of ways. For example, Nevada and Oklahoma require pretrial hearings or other disclosures before testimony from jailhouse informants may be offered into evidence. *D'Agostino v. State,* 823 P.2d 283, 285 (Nev. 1991) (per curiam) (requiring pretrial hearings in context of penalty phase of capital trial); *Dodd v. State,* 993 P.2d 778, 784–85 (Okla. Crim. App. 2000) (requiring extensive pretrial disclosure and pretrial hearing on reliability and also permitting instruction that emphasized the need for exceptional care in evaluating jailhouse informant testimony). Montana and Oklahoma have approved of jury instructions cautioning the jury about the danger of undue reliance upon jailhouse informant testimony. *State v. Grimes,* 982 P.2d 1037, 1043 (Mont. 1999); *Dodd,* 993 P.2d at 784.

2. *Comparison to eyewitness identification.* In some ways, the arguments against admission of jailhouse informants are similar to arguments about the unreliability of eyewitness identification. There are differences, however. Unlike in the field of eyewitness identification, there is not a large body of empirical social science establishing consensus categorical principles related to jailhouse informants' testimony. In the field of eyewitness identification, there are literally

thousands of studies that demonstrate the consensus propositions, including that human memory is not like a camera or video, that memory rapidly decays in a matter of hours, that photo arrays should be carefully assembled and administered on a double-blind basis, that even subtle suggestions can irreversibly taint the identification process, and that show ups are inherently unreliable. *See generally State v. Doolin*, 942 N.W.2d 500, 518–30 (Iowa 2020) (Appel, J., dissenting) (canvassing scientific and social psychology articles and research on the unreliability of eyewitness identification); *State v. Shorter*, 893 N.W.2d 65, 81–82 (Iowa 2017) (discussing the unreliability of eyewitness identification).

There are no comparable, well-supported, consensus scientific principles related to jailhouse informants that might be counterintuitive to jurors. Psychological research on informants goes back only a decade or so and is still developing. *See, e.g.*, Jeffrey S. Neuschatz et al., *The Effects of Accomplice Witnesses and Jailhouse Informants on Jury Decision Making*, 32 L. & Hum. Behav. 137, 146 (2008) (conducting experiments on the effect of jailhouse informants on jury decision-making and concluding that "juror conviction rates were unaffected by whether or not the cooperating witness received an incentive in exchange for his testimony—despite the fact that participants perceived the witnesses who received incentives as less interested in serving justice and more interested in serving self-interests"); Jessica K. Swanner et al., *Snitching, Lies, and Computer Crashes: An Experimental Investigation of Secondary Confessions*, 34 L. & Hum. Behav. 53, 53–61 (2010) (discussing the problem of relying on

secondary confession and highlighting the biased nature of jailhouse informants' testimony because of their incentive to provide testimony); Jessica K. Swanner & Denise R. Beike, *Incentives Increase the Rate of False but Not True Secondary Confessions From Informants With an Allegiance to a Suspect*, 34 L. & Hum. Behav. 418, 425–27 (2010) (conducting an experiment with 192 participants on the role incentives play in procuring secondary confessions and concluding that the offer of incentive made more people willing to sign a false secondary confession implicating a close other).

Jailhouse informants, known in the defense bar as "snitches," are often not warm and fuzzy characters readily embraced by jurors. As noted by Justice Sotomayor in *Perry v. New Hampshire*, "Jailhouse informants, unreliable as they may be, are not similarly resistant to the traditional tools of the adversarial process and, if anything, are met with particular skepticism by juries." 565 U.S. 228, 262 (2012) (Sotomayor, J., dissenting) (citation omitted). Circuit Judge Stephen Trott made a similar observation years ago in a classic essay: "Ordinary decent people are predisposed to dislike, distrust, and frequently despise criminals who 'sell out' and become prosecution witnesses." The Honorable Stephen S. Trott, *Words of Warning for Prosecutors Using Criminals as Witnesses*, 47 Hastings L.J. 1381, 1385 (1996). So, cross-examination and effective advocacy are more likely to address shortcomings in jailhouse informant testimony than in the context of eyewitness identification, where studies show juries are resistant to unintuitive but well-established scientific principles related to eyewitness identification.

That said, there are still reasons to be concerned about the reliability of the testimony of jailhouse informants. Some jurors may not be fully familiar with the power relationships that affect persons who are traveling in and out of the revolving door of the criminal justice system. Further, sophisticated law enforcement officers and informers recognize that there often cannot be an express or even implied agreement of reduced sanctions until after testimony has been given, thereby limiting the ability of defense counsel to impeach jailhouse informants. *See* Robert M. Bloom, *What Jurors Should Know About Informants: The Need for Expert Testimony*, 2019 Mich. St. L. Rev. 345, 352–53 (noting studies by Professor Garrett show that jailhouse informants mostly claimed prosecutors did not make explicit promises to them but that they ultimately received benefits after testifying (citing Brandon L. Garrett, *Convicting the Innocent: Where Criminal Prosecutions Go Wrong* 124 (2011))). Further, it can be very difficult for defense lawyers to engage in meaningful discovery regarding informants.

3. *State court cases under Iowa Rule of Evidence 5.403.* A number of state courts have considered challenges to the admissibility of jailhouse informant testimony under their state's equivalent of Iowa Rule of Evidence 5.403. The courts have generally declined to exclude jailhouse informant testimony on the ground that the testimony was highly relevant and that the matter of credibility was for the jury. *See, e.g.*, *Shanklin v. State*, 187 So. 3d 734, 780 (Ala. Crim. App. 2014); *State v. Rhoades*, 809 P.2d 455, 463–65 (Idaho 1991), *aff'd sub nom. Rhoades v. Henry*, 598 F.3d 511 (9th Cir. 2010); *Myers v. State*, 33 N.E.3d 1077,

1109–10 (Ind. Ct. App. 2015); *West v. Commonwealth*, 161 S.W.3d 331, 335–36 (Ky. Ct. App. 2004); *State v. Asante*, 236 A.3d 464, 465 n.1 (Me. 2020).

4. *Discussion of the merits.* Based on the totality of the circumstances, we conclude that the district court did not abuse its discretion by refusing to exclude the testimony of Reising. Liggins makes what amounts to a categorical challenge to all jailhouse informant testimony, an attack that was rejected in *Thomas v. State*, 853 S.E.2d at 116–17.

It is true, perhaps, that Reising had animus toward Liggins as an apparent sex offender. At Liggins's 2018 trial, he testified, "If I had my way about it, he wouldn't be sitting here in that chair today." Reising called him a "chimo," a slang term for child molester. He stated that Liggins was a "lucky[] boy" at his first hearing on postconviction relief, a comment which suggested an aura of superiority, if not racial superiority, which Reising denies. A reasonable person might question whether a person in Liggins's predicament would blurt out a confession in response to Reising's identification of Liggins as a suspect in the crime in the first place. One in Liggins's position might be concerned that Reising was a snitch, not to mention Reising did not present as a member of the church choir.

Yet, unlike the situation with eyewitness testimony, there is currently no toolbox of consensus scientific principles that apply to the testimony of jailhouse informants. While there are obvious reasons to be concerned about the reliability of jailhouse informants, until there is a more robust body of useful social science or other information to structure our consideration of the probative value or

reliability of the testimony of jailhouse informants, a categorical approach to exclusion of jailhouse informant testimony is not appropriate. As a result, we find the district court did not abuse its discretion in permitting the admission of the Reising testimony under rule 5.403.

**VI. Admission of Eyewitness Testimony of Antonio Holmes.**

**A. Introduction.** Liggins asserts that Holmes's identification of Liggins as the man standing outside a liquor store on September 17 when J.L. was purchasing gum was so unreliable that it should have been excluded from evidence under Iowa Rule of Evidence 5.403. The trial court refused to exclude the testimony of Holmes regarding his identification of Liggins.

**B. Position of Liggins.** Liggins cites recent authority for the proposition that eyewitness testimony is notoriously unreliable. *See State v. Folkerts*, 703 N.W.2d 761, 763–65 (Iowa 2005) (stating that "studies have shown the primary cause for the conviction of innocent people in our criminal justice system is mistaken eyewitness identification" and citing Gary L. Wells, *Eyewitness Identification Evidence: Science and Reform*, The Champion, Apr. 2005, at 12); *see also Perry*, 565 U.S. at 263–65 (noting that studies show eyewitness recollections are highly susceptible to distortion by postevent information or social cues, that jurors overestimate the accuracy of eyewitness identifications, and that jurors place greatest weight on witness confidence); *State v. Henderson*, 27 A.3d 872, 907 (N.J. 2011) (noting that memory never improves over time); J. Wixted & G. Wells, *The Relationship Between Eyewitness Confidence and Identification Accuracy: A New Synthesis*, 18 Psych. Sci. In Pub. Int. 10, 14,

19–21, 51–52 (2017). Relying on the concepts presented by these authorities, Liggins points to circumstances surrounding Holmes's original identification of Liggins and the later suggestive procedures that tainted the second identification.

First, Liggins points to problems with the original identification by Holmes: Holmes's opportunity to view the man standing outside Mac's Liquor store was brief. In the days after September 17, Holmes was likely exposed to media coverage of the crime. When Holmes arrived at the police station to make his initial identification, Holmes was intoxicated, having consumed two 40-ounce bottles of beer. Holmes's intoxication was noticed by the police. The very next day, Liggins notes, Holmes called the police and was not sure of his identification because he had been drinking.

While Liggins asserts that the original identification was of limited value because of the limited opportunity to observe the man, potentially suggestive media exposure, Holmes's intoxication at the time of the identification, and Holmes's uncertainty the day after the original identification, Liggins also cites additional post-identification events as further escalating the unreliability of Holmes's identification. First, Liggins asserts that an identification at a deposition is a species of mugshot show-up and is improperly suggestive. When Holmes returned to the police station after questioning his identification, Holmes was shown a one-person mugshot, and Holmes could not definitively make the identification from the mugshot. According to Liggins, by showing Holmes a one-person mugshot, any subsequent process was tainted. *See Folkerts*, 703

N.W.2d at 765; *see also* Kenneth A. Deffenbacher et al., *Mugshot Exposure Effects: Retroactive Interference, Mugshot Commitment, Source Confusion, and Unconscious Transference*, 30 L. & Hum. Behav. 287, 299 (2006). While Holmes stated at his deposition after seeing Liggins in person that he was sure it was him, Liggins asserts that studies show that memory never improves over time. Given the course of events, Liggins asserts there is no way to know twenty-five years later whom Holmes really saw outside Mac's Liquor store on the night of the murder.

If the identification was so unreliable that it should have been excluded, Liggins argues that prejudice should be assumed. *See Russell*, 893 N.W.2d at 314. Liggins emphasizes that "there is almost *nothing more convincing* [to a jury] than a live human being who takes the stand, points a finger at the defendant, and says 'That's the one!'" *Watkins v. Sowders*, 449 U.S. 341, 352 (1981) (Brennan, J., dissenting) (quoting Elizabeth F. Loftus, *Eyewitness Testimony* 19 (1979)).

**C. Position of the State.** The State argues that determining the reliability of the testimony of Holmes was a matter for the jury. The State notes that at trial, the defense was able to cross-examine Holmes regarding the potential flaws in his testimony. The State further observes that Liggins was able to challenge the reliability of the testimony in opening and closing arguments. Finally, the State opines that the jury was instructed regarding eyewitness testimony and various matters to consider in evaluating the evidence.

In support of its argument, the State cites a number of recent precedents: In *State v. Doolin*, the majority stated, "Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature." 942 N.W.2d at 511 (majority opinion) (quoting *Manson v. Brathwaite*, 432 U.S. 98, 116 (1977)). Similarly, in *State v. Booth-Harris*, the majority observed that the fact that a witness may have been under the influence of drugs at the time of the eyewitness identification was a matter for the jury to consider rather than a basis for exclusion of evidence. 942 N.W.2d 562, 576 (Iowa 2020). While the State recognizes that recent social science data challenges the reliability of eyewitness identification, the State notes that in *Doolin*, the court declined to reconsider its precedents in view of social science data. *Doolin*, 942 N.W.2d at 507–08.

**D. Discussion.** In *Doolin*, the court considered whether the admission of first-time in-court eyewitness identification two years after the event was so unfair as to offend due process of law under the United States or Iowa Constitutions. *Id.* at 502–03. The court ruled that no constitutional violation was present. *Id.* at 516. Specifically, the court declined to modify a five-factor test for reliability of eyewitness testimony developed in 1976 by the United States Supreme Court in *Neil v. Biggers*, 409 U.S. 188, 198–200 (1972). *Doolin*, 942 N.W.2d at 512. The *Doolin* court made clear, however, that science could be considered in evaluating the admissibility of eyewitness identification under the rules of evidence. *Id.* at 508–11, 510 n.4; *see also Booth-Harris*, 942 N.W.2d at 572.

The leading case harnessing the eyewitness science in the context of the rules of evidence is *State v. Lawson*, 291 P.3d 673 (Or. 2012) (en banc). Other courts have incorporated eyewitness science into their analysis under rules of evidence similar to Iowa Rule of Evidence 5.403. *State v. Lujan*, 459 P.3d 992, 1003–04 (Utah 2020); *State v. Hibl*, 714 N.W.2d 194, 202–06 (Wis. 2006).

We now briefly survey the facts surrounding Antonio Holmes's identification of Liggins. After news reports of the murder, Holmes contacted Rock Island police and advised them that he had information about the events leading up to the murder. Holmes told police that on the evening of September 17, 1990, he entered Mac's Liquor store to buy some beer. After parking his vehicle, he passed by a person outside the store waiting at a corner. Holmes reported asking the man, "How's it going," as he passed by, with the man responding, "Okay." When inside the store, Holmes saw a young girl buying some kind of gum. After Holmes made his purchase, he left the store but did not see the man or the little girl when he left the premises.

On September 21, Holmes identified Liggins without hesitation from a series of six photographs presented to him as the person he saw outside Mac's Liquor store. But it turns out that Holmes had been drinking at the time of the identification. The officer administering the identification stated that Holmes was intoxicated. Holmes himself admitted drinking but that he was not "drunk, drunk."

The following morning, Holmes called the police and advised that he was not sure his identification was accurate. Holmes returned to the police station

and was put in a room with six officers. He was shown a mugshot photo of Liggins and asked if he was the person Holmes saw at Mac's Liquor store on September 17. Holmes responded, "I'm not sure." Under further prompting from police, Holmes stated that the photo "looks a lot like him" and that the photo "resembles" him but that he "couldn't swear" to the identification. Police made an audio recording of an interview with Holmes summarizing the above events.

Two years later, Holmes attended a deposition in the case. At the deposition, he identified Stanley Liggins as the person he had seen two years earlier standing outside Mac's Liquor store. Liggins also identified Holmes from the witness stand at trial.

We begin our analysis of the rule 5.403 evidentiary issue with the first identification made by Holmes. Although the encounter was relatively brief, Holmes was not under stress at the time. Further, the encounter occurred during daylight hours. There was evidence that Holmes had been drinking when he made the identification, but, in Holmes's words, he was not "drunk, drunk." Further, Holmes made a positive identification of Liggins from an unchallenged photo array. While Holmes backtracked the next day from his positive identification, his prior identification still has probative value. He was a disinterested witness who voluntarily appeared at the police station and identified Liggins as present at Mac's Liquor store at the same time as the victim.

Under these circumstances, it was within the district court's discretion under rule 5.403 to admit Holmes's original identification on September 21 that was not tainted by suggestive police procedure. *United States v. Wade*, 388 U.S.

218, 242 (1967) (suggesting tainted in-court identifications could nevertheless be admitted if they had an independent origin); *State v. Haugen*, 392 P.3d 306, 312 (Or. 2017) (en banc) (stating that when a witness's perceptions are able to support an inference of identification, albeit met with competing evidence of impermissible basis for that inference, the initial admissibility could establish a minimum baseline of reliability); *Lawson*, 291 P.3d at 699 (holding that witnesses' identifications were proper because they were based on prior untainted observations and not the result of a later unduly suggestive procedure); *Commonwealth v. Santiago*, 209 A.3d 912, 931–33 (Pa. 2019) (holding that officer's in-court identification could be admitted because the officer could have identified the defendant from an untainted independent source). Of course, it would be misleading and incomplete for the district court to admit evidence of the original identification but not the testimony about his backtracking the following day. But the district court properly admitted evidence of the subsequent backtracking for the jury to evaluate.

The district court, however, went further by permitting the admission of evidence of Holmes's identification of Liggins at his deposition and in trial. If these identifications were the only ones offered by the State, we would face a different question, as exclusion may have been required under rule 5.403. Yet, under the unique facts presented, we do not find reversible error. Where a witness made a positive identification a few days after the event from an unchallenged photo array, and where the defense is able to challenge the identification as a result of uncertainty the following day, we do not find the

district court abused its discretion by permitting the State to seek to identify Holmes through the admission of the later identifications in the deposition and at trial.

**VII. Exclusion of Hearsay Statement of Victim Prior to Death.**

**A. Introduction.** Liggins sought to introduce into evidence childhood statements made by J.L. to a friend, Judy Gonzales, pursuant to the residual hearsay exception in Iowa Rule of Evidence 5.807. Liggins made an offer of proof through the testimony of Gonzales and her therapist. Liggins sought to introduce testimony from Gonzales that during the summer of second or third grade, J.L. told her that when her mom was gone from home, "bad things happen to her." Gonzales did not tell anyone because she "pinky promised" not to do so.

The district court determined that Gonzales's testimony did not satisfy the residual hearsay exception and excluded the testimony. We review rulings on the admission of hearsay for correction of errors at law. *State v. Neitzel*, 801 N.W.2d 612, 621 (Iowa Ct. App. 2011).

**B. Position of Liggins.** In order to prevail under rule 5.807, Liggins recognizes that he must meet the five factors established in *State v. Veverka*, 938 N.W.2d 197, 200 (Iowa 2020) ("(1) trustworthiness; (2) materiality; (3) necessity; (4) notice; and (5) service of the interests of justice." (quoting *State v. Weaver*, 554 N.W.2d 240, 247 (Iowa 1996), *overruled on other grounds by State v. Hallum*, 585 N.W.2d 249, 254 (Iowa 1998))). In this case, according to Liggins, necessity and notice were not issues. The district court denied admission with concerns

about trustworthiness, materiality, and whether justice would be served through the admission of the Gonzales testimony.

Liggins maintains that Gonzales's testimony was trustworthy. Liggins asserts that J.L.'s confidence in her friend about "bad things" at home "has [a] ring of truth" to it. While Liggins recognizes that the district court questioned Gonzales's credibility in light of the long delay in reporting the incident, Liggins asserts that the credibility prong of the *Veverka* test goes to the credibility of the declarant, not the witness. Liggins suggests that any problems with credibility could be explored on cross-examination.

On the materiality issue, Liggins asserts that if her stepfather were abusing J.L., it would suggest that J.L.'s stepfather was involved in the murder of J.L., who was sexually abused prior to her death. Liggins appears to believe that the phrase "bad things happen to her" was a coded reference to sexual abuse and not some other form of behavior that J.L. considered "bad."

Liggins argues that admission of the evidence serves the interests of justice. Liggins asserts that because of its trustworthy character and materiality, the admission of the Gonzales testimony advances the truth-seeking process that underlies the rule.

If the evidence was wrongly excluded, Liggins claims he is entitled to a new trial. Liggins asserts that the State's evidence was circumstantial. Liggins further notes that a hung jury occurred in the third trial in 2018, demonstrating the closeness of the case.

**C. Position of the State.** The State asserts that the district court did not err in rejecting the evidence. The State maintains that it strains credulity for a witness to remember a one-time conversation so many years ago. The assertion of the witness that she kept a promise for thirty years when she and J.L. were six or seven until she received a sign from God is not believable. In any event, the State points out that even on its face, the notion that "bad things happen to her" when she was alone with Glenn is too vague to be material. In any event, because the evidence shows that Glenn was either at home or looking for the victim after she went missing, any error was harmless.

**D. Discussion.** We agree with the State. At the outset, we note that the residual exception in rule 5.807 provides a narrow exception to be applied sparingly. In commenting on the similar federal rule, the Federal Advisory Committee on the Rules of Evidence originally noted that: "[A]n overly broad residual exception could emasculate the hearsay rule and the recognized exceptions or vitiate the rationale behind codification of the rules . . . . It is intended that the residual exceptions will be used very rarely, and only in exceptional circumstances." *See* Laurie Kratky Doré, *Iowa Practice Series Evidence* § 5.807:1, at 1214 (2020) (alteration and omission in original) (quoting Fed. R. Evid. 803(24) advisory committee's note (Federal Rule 803(24) has been moved to and renumbered Federal Rule 807)).

Like the district court, we are troubled by whether a vague statement made thirty years ago by a young child to a friend is sufficiently trustworthy to be admitted under the rule. In evaluating trustworthiness, we may consider both

the trustworthiness of the declarant and the credibility of a witness reporting the statement. *Id.* at § 5.807:1, at 1218. A vague statement that does not establish a clear fact may be less trustworthy. *See United States v. Phillips*, 219 F.3d 404, 419 (5th Cir. 2000) (excluding an "arguably vague" statement under residual exception); *State v. Saucier*, 926 A.2d 633, 648–49 (Conn. 2007) (rejecting application of residual exception to ambiguous statement). We see no reversible error where the district court excluded on trustworthiness grounds the suggestion that Ms. Gonzales kept a "pinky promise" regarding a brief comment made thirty years ago by two young girls aged six and seven until she received a sign from God at a supermarket decades later.

**VIII. Denial of Motion for New Trial.**

**A. Introduction.** Liggins moved for a new trial pursuant to Iowa Rule of Criminal Procedure 2.24(2)(*b*)(6). A new trial should be granted "in the extraordinary case in which the evidence preponderates heavily against the verdict rendered." *State v. Ary*, 877 N.W.2d 686, 706 (Iowa 2016).

A district court's ruling that the verdict is not contrary to the weight of the evidence is reviewable for abuse of discretion. *Id.* An abuse of discretion occurs when it is shown that the district court "exercised its discretion on grounds or for reasons clearly untenable or to an extent clearly unreasonable." *State v. Reeves*, 670 N.W.2d 199, 202 (Iowa 2003).

**B. Position of Liggins.** In support of his claim that the district court abused its discretion in denying a new trial, Liggins marches through the evidence. He notes that even the district court found W.H. not credible. Liggins

asserts that while the district court found that Holmes was "truthful," the real issue is not whether he testified as he honestly believed but whether his identification was accurate. Liggins cites caselaw for the proposition that "eyewitnesses generally act in good faith" and misidentifications typically are "not the result of malice." *Henderson*, 27 A.3d at 888. The question, according to Liggins, is not whether Holmes was truthful, it is whether he was accurate in identifying Liggins.

Liggins attacks evidence seeking to place him near the Jefferson Elementary school at the time the fire and body were discovered. Liggins notes that Lloyd Eston testified that he saw a car in the vicinity of the school with a man standing near an open trunk but could not recall the race or identify the man. Further, though he said the vehicle he saw was similar to the maroon Peugeot, he could not be sure the red Peugeot was the vehicle he saw that night.

Liggins makes much of the fact that the district court in denying the motion for a new trial seemed to be confused about who testified about what. Although the district court found W.H. not reliable, the district court appeared to rely on her testimony but believed it was presented by Eston. According to the district court, Eston testified that Liggins was familiar with the area and that the car he saw had distinctive taillights. But Eston did not so testify. W.H. testified as to these facts. She testified that she had seen Liggins before in a pool hall and a home in the neighborhood of the school and that the vehicle she saw near the school on the evening of September 17 had one taillight brighter than the other.

In light of the district court's misunderstanding of the record, Liggins asks for a remand to the district court where the district court may consider the motion for a new trial with an accurate understanding of the record. *See Reeves*, 670 N.W.2d at 203.

**C. Position of the State.** The State contests issue preservation to a limited extent. The State agrees that Liggins preserved his claim generally that the conviction was contrary to the weight of the evidence. But the State asserts that Liggins did not claim below that the trial court's ruling was inaccurate, and as a result, any remand to clarify the flaws in the district court's opinion has been waived. *See Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002).

On the merits, the State concedes, as it must, that no physical evidence linked Liggins to the murder. However, the State asserts the circumstantial evidence was sufficient to support the jury's verdict.

**D. Discussion.** We agree with the State. Specifically, the evidence showed that Liggins knew he had privately spoken with J.L. on the street the afternoon of her death and that Liggins had asked her to buy gum at Mac's Liquor store for him when they were at the Glenn house. There was evidence that after J.L. departed to buy the gum, Liggins departed as well. After Liggins left the Glenn home, he called the Glenns at 7:48 p.m. to inquire whether J.L. had returned home. Liggins later appeared at the Glenn home that night and suggested that the Glenns call 911, but he did not stay to assist in the search for J.L. There was evidence that Liggins's distinctive automobile was seen in the vicinity of the school where J.L.'s body was burned and ultimately discovered. The record

reveals that Liggins went to his girlfriend's house that evening, arrived at midnight rather than at 10 o'clock as planned, acted strangely by asking her if "she would love him no matter what," and returned to his apartment in the early morning hours and took a long shower. The day after the crime, a witness observed Liggins's vehicle parked in a parking lot near his apartment. The vehicle reeked of gasoline emanating from a gas can in the backseat of the vehicle. When questioned by police, Liggins claimed that he had not talked to J.L. prior to sending her for the gum but then reversed course and admitted that he had when confronted with contrary evidence. There was evidence that Liggins told Reising, "I may have done it, but I'm not going to get caught." J.L.'s body was in a plastic garbage bag that was at least similar to garbage bags used at Liggins's apartment complex.

The district court did state that the testimony of W.H., who had testified that Liggins's automobile with the distinctive taillights was in the area of the Jefferson Elementary school the night of the murder, was "a little bit all over the map." The district court went on to state that it was not clear how important her testimony was because there were "other people who saw this car in the area at the time the body was burning."

Liggins attacks the district court's narrative in its ruling as not precise. W.H. was the only witness who specifically testified that a car with one brake light brighter than the other, a distinctive feature of Liggins's auto, was in the vicinity of the school at the time of the fire. Eston testified only that a car similar to Liggins's was in the area of the school at the time the body was burning. We

do not regard this imprecision as material in connection with the motion for a new trial. While the district court found the testimony of W.H. "a little bit all over the map," it did not find her testimony about the car uncredible. Eston did testify that an automobile similar to Liggins's vehicle was in the vicinity and described the vehicle as a red, four-door foreign car. Finally, in any event, Liggins did not bring the claimed inaccuracy to the attention of the district court after entering the ruling, and as a result, the claim was waived. *See Meier*, 641 N.W.2d at 537.

### IX. Motion to Dismiss on Due Process Grounds.

**A. Introduction.** Liggins sought to dismiss the case after the case was remanded for a new trial and repetitively raised the motion in subsequent proceedings. In the motion to dismiss, Liggins claimed that continued prosecution violated due process under the Fifth Amendment to the United States Constitution and article I, section 9 of the Iowa Constitution. Review of a motion to dismiss is for errors at law. *State v. Rimmer*, 877 N.W.2d 652, 660 (Iowa 2016). Constitutional issues, however, are subject to de novo review. *State v. Lange*, 531 N.W.2d 108, 111 (Iowa 1995).

**B. Position of Liggins.** Liggins argues that in this case, the combination of withheld exculpatory evidence, including police reports and the information that a key witness was a paid confidential informant, and the length of time between Liggins's first two trials and the remand for retrial in 2014 violated Liggins's due process rights. He notes that one of the purposes of the due process clause is "to prevent prejudice to the defense caused by passage of time." *United States v. MacDonald*, 456 U.S. 1, 8 (1982).

Liggins draws an analogy to Fifth Amendment speedy trial claims. In these cases, the defendant may establish a violation by showing "(1) the delay was unreasonable; and (2) the defendant's defense was thereby prejudiced." *State v. Trompeter*, 555 N.W.2d 468, 470 (Iowa 1996).

Liggins claims that in this case, the delay was unreasonable due to the suppression of material evidence by the State in violation of *Brady* principles. Liggins recognizes that the usual remedy for a *Brady* violation is a remand for a new trial. But, according to Liggins, given the remarkable passage of time, Liggins claims dismissal is required.

On the prejudice issue, Liggins notes that two witnesses, Donna Adkins and Daryl Sheese, were deceased by the time of trial. As a result, Liggins claims he could not cross-examine Adkins about the newly discovered information about a brown mustang in the Hillside parking lot that could have undermined Atkins's testimony.

In addition, Liggins notes that Theresa Held, a potential witness, had died prior to the 2019 trial. Liggins asserts that Held told police she heard Joe Glenn state that he wished to videotape himself engaging in sexual acts with J.L. Liggins was also unable to cross-examine Joe Glenn on this topic because at the time of the 2019 trial, he was missing and presumed dead.

Liggins further asserts that because of the passage of time, he was unable to effectively cross-examine W.H., a key witness for the State. By 2019, W.H. was not deceased, but her memory and vision were severely impaired. Liggins asserts that at the 2019 trial, W.H. denied making an anonymous phone call to police

even though she gave previous testimony to that effect, could not point out the house from which she viewed the fire, was unable to recall her prior testimony about where she was when saw the fire, was unable to read her previous testimony to refresh her recollection, failed to recall her initial interaction with police (explaining she was a diabetic and had suffered a stroke), failed to recall how long it was between her seeing the fire and the arrival of emergency personnel, denied that she previously testified she saw a fire, and denied that it was dark out when she saw the fire and generally explained on the witness stand that she was having a "diabetic crash" and could not "think fast" in response to questions.

Liggins also points to prior testimony admitted in the 2019 trial from Lloyd Eston. As early as 1995, Eston's testimony was so confused that the trial court declared him unavailable for trial and his prior testimony in the first trial was read into the record. But, notes Liggins, the jury did not get to see a live witness with the disorientation and confusion that Eston exhibited in 1995 when his prior trial testimony was read into the record in his 2019 trial.

All in all, twenty-two of the fifty-four witnesses had died by the time of the 2019 trial. Because of the delay, Liggins urges us to find a due process violation under the Iowa and United States Constitutions. He notes Iowa precedent holding that due process seeks to prevent "the possible impairment of the accused's defense due to diminished memories and loss of exculpatory evidence." *State v. Olson*, 528 N.W.2d 651, 654–55 (Iowa Ct. App. 1995). Because it was

impossible for Liggins to get a fair trial thirty years after the murder, he seeks dismissal of the prosecution as violating due process of law.

**C. Position of the State.** The State frames the issue as one of the appropriate remedy for a *Brady* violation. It asserts that when *Brady* violations occur, as they did in this case, the proper remedy is not dismissal but remand for a new trial. *California v. Trombetta*, 467 U.S. 479, 486–87 (1984); *State v. Hillsman*, 281 N.W.2d 114, 117 (Iowa 1979).

The State next claims that even if the due process standard for preaccusatorial delay were applied in this case, there is no basis for dismissal. Like Liggins, the State sees an analogy in the preaccusatorial delay cases. According to the State, under the first prong of the preaccusatorial delay test, a defendant must prove that the state intentionally delayed the case in order to obtain a tactical advantage over the defendant. *State v. Isaac*, 537 N.W.2d 786, 788 (Iowa 1995); *State v. Edwards*, 571 N.W.2d 497, 501 (Iowa Ct. App. 1997). Here, although a *Brady* violation occurred, the State argues there was never a finding that the State sought to delay the trial for strategic advantage.

The State also claims that Liggins has failed to show actual prejudice. The State asserts that Liggins's ability to cross-examine Donna Adkins was not substantially impaired by the fact that Sheese, Saunders, and Armstrong did not recall seeing Liggins's car in the Hillside parking lot on September 18.

With respect to Theresa Held, the State points out that her claim that Joe Glenn wanted to videotape a sexual encounter between himself and the victim was not credible. The State notes that Held initially denied having heard the

statement but then changed her position during the police interview. Further, another person who was present at the time of the alleged sexualized statement told police he had never heard Glenn make the statement. Finally, the State argues that the evidence shows that Glenn was either at home or searching for the victim on the night at question.

Lastly, the State notes that W.H. was not as impaired as claimed by Liggins. In any event, the State argues that the lapses in memory and denials of W.H. on certain matters, which caused her to be impeached, tended to favor Liggins, not cause him prejudice.

**D. Discussion.** The lengthy delay in the trial and conviction of Liggins in this matter is troubling. Whenever a trial is delayed, for whatever reason, there is a risk that evidence will dissipate through decaying memories and ultimately the death of witnesses. Ordinarily, the risk of loss of evidence is cabined by a statute of limitations, but here, there is no statute of limitations for first-degree murder. *See De La Beckwith v. State,* 707 So. 2d 547, 568 (Miss. 1997) (en banc) (noting lack of statute of limitations in twenty-six-year-old murder case).

In this case, Liggins was originally convicted of first-degree murder and other crimes in 1993. But, after an unsuccessful direct appeal, two actions for postconviction relief cumulatively showed that the State had failed to produce exculpatory evidence, which required a new trial. The winding course of appellate review, along with a hung jury, delayed the trial until 2019.

No one doubts that it would have been preferable, perhaps for both the State and Liggins, if the matter had come to a successful conclusion more

expeditiously. But there is no evidence, as required by the preaccusatory due process cases that both sides assert apply in this case, that the State deliberately used delaying tactics for the advantage of the State. *United States v. Gouveia*, 467 U.S. 180, 192 (1984); *Edwards*, 571 N.W.2d at 501. The delay in this case was a result of the course of appeals and actions for postconviction relief. That is not to say the State has not made mistakes, which it surely did when it failed to timely produce exculpatory material, but there is no evidence that the mistakes were designed to impose delay in bringing the case to a conclusion and essentially run out the clock on the possibility of an effective defense by Liggins. *See United States v. Beszborn*, 21 F.3d 62, 65–66 (5th Cir. 1994) (requiring intentional delay for due process claim based on preaccusatorial delay).

We also find the specific assertions of prejudice presented by Liggins are insubstantial. We do not believe the death of Adkins caused major problems given that the potential testimony from Sheese or Armstrong would not have had significant value for the impeachment of Adkins. While Liggins claims the passage of time impaired the memory of W.H. in the 2019 trial, we view the impeachment of W.H. as not seriously impaired and, if anything, may have been more successful than in previous trials. With respect to Held, her claim that Joe Glenn stated he was interested in producing sexually explicit videos with his wife and stepdaughter J.L. was contradicted by others allegedly present at the time. Further, Joe Glenn's whereabouts during the period of time when the crime likely occurred was largely accounted for by his wife and others.

That leaves us with a general claim of prejudice arising from a thirty-year delay from the commission of the crime to the verdict in this case. In the context of due process claims on preaccusatorial delay, prejudice is not presumed, but must be demonstrated. *United States v. Marion*, 404 U.S. 307, 310 (1971); *Beszborn*, 21 F.3d at 67 ("Vague assertions of lost witnesses, faded memories, or misplaced documents are insufficient to establish a due process violation from pre-indictment delay."). We apply the same principle in this setting and find that general assertions of prejudice are insufficient to establish a due process claim. Liggins's specific claims of prejudice are insubstantial. We do not rule out the possibility that perhaps a lengthy delay in a criminal case might cause sufficient prejudice to arise to a due process problem, but this case is not one of them.

**X. Conclusion.**

For the above reasons, we affirm Liggins's conviction.

**AFFIRMED.**